UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| ONWARD SEARCH LLC,<br>                  Plaintiff,<br><br>vs.<br><br>J. DOUGLAS NOBLE,<br>                  Defendant. | Civil Action No.<br><br><br>**COMPLAINT** |

Plaintiff Onward Search LLC ("Onward" or "Plaintiff") by and through its attorneys, Nelson Mullins Riley & Scarborough LLP, as and for its Complaint against J. Douglas Noble ("Noble" or "Defendant") respectfully alleges as follows:

**NATURE OF THE ACTION**

1. This is an action by Onward, a national firm specializing in job placement and staffing for the digital, creative, and marketing industries, for damages and equitable relief against Noble—a high level executive and Onward's former Vice President of Client Services for the Northeast—for violating a covenant not to compete and a covenant not to directly or indirectly solicit Onward's clients ancillary to his employment contract with Onward by working for Beacon Hill Staffing ("Beacon") and through efforts to solicit or assist Beacon to solicit an Onward client in violation of his employment contract immediately after resigning from Onward.

2. At the commencement of his employment with Onward on June 18, 2008, Noble worked as a Recruiter from Onward's Wilton, Connecticut office.

3. Noble was a highly valued employee and rose to the level of Vice President of Client Services, a senior executive position, overseeing Onward's most significant client relationships spanning the Northeast, managing Account Executives (also referred to as "Client Relationship Managers") and recruiters who serviced accounts in Onward's Northeastern

territories, and holding a key management position in the Company.

4. While employed with Onward, Noble received the highest level access to Onward's confidential information and trade secrets, including, but not limited to, lists of clients and prospects, all contacts at each client, lists of talent/candidates, open jobs, lists of placements, bill and pay rates, sales pipelines, activity and production metrics, all contracts, compensation and incentive plans for all staff, office business plans and budgets, and access to financial information for the territories he supervised such as revenue and gross margin, and worked directly with Onward's clients and recruiting prospects.

5. Through Bullhorn, Onward's internal database that contains all of Onward's data regarding candidates and clients, Noble had access to production information related to all of Onward's offices.

6. Finally, as Vice President of Client Services, Noble had access to Onward's Report Server, which is restricted to managers who are director level and above, and enables users to run detailed activity and production reports, which includes client level details associated with all Onward's offices.

7. Upon information and belief, Noble is now using Onward's confidential and trade secret information to compete unfairly against Onward on behalf of his new employer, Beacon.

8. On February 7, 2022, Noble resigned from Onward to accept employment at Beacon, a direct competitor led by, among others, Leanne Owens, Onward's former Senior Vice President against whom Onward previously pursued legal claims to enforce her employment agreement before this Court.

9. Upon information and belief, Noble is working remotely for Beacon from his home in Plymouth, Massachusetts, the same location from which he performed his job duties and

serviced clients for Onward.

10. Noble's employment at Beacon blatantly violates his employment agreement.

11. Noble's employment at Beacon places Onward at significant risk that its confidential information and trade secrets will be shared with Beacon, a direct competitor, used to recruit away Onward's employees in Massachusetts and throughout the United States, used to solicit Onward's current and prospective clients, and/or used to fill open positions for Beacon's current and prospective customers. Such conduct threatens an additional breach of Noble's employment agreement.

12. Noble is unfairly competing with Onward by engaging in recruiting, staffing, and/or talent acquisition services for Beacon in or around Plymouth, Massachusetts for companies located in the Northeast and throughout the United States.

13. To prevent further irreparable injury, Onward seeks immediate temporary injunctive relief in the form of preliminary and permanent injunctions and a temporary restraining order: (a) requiring Noble to discontinue his employment with Beacon for twelve months; (b) requiring Noble not to solicit Onward's customers, talent and employees; and (c) prohibiting Noble from retaining, using, and misappropriating Onward's files, confidential information, and trade secrets.

14. Onward also seeks economic damages and attorneys' fees for Noble's unlawful activity.

## JURISDICTION

15. The Court has subject-matter jurisdiction over Onward's claims pursuant to 28 U.S.C. § 1332 because it is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

16. This Court has personal jurisdiction over Noble because his tortious acts caused injury to Onward at its corporate headquarters in Connecticut and because, under the terms of his employment agreement, Noble submitted himself to personal jurisdiction in Connecticut.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Onward resides in the district, with its corporate office located at 40 Danbury Road, Wilton, Connecticut.

## PARTIES

18. Plaintiff Onward is a Delaware corporation with a principal place of business located at 40 Danbury Road, Wilton, Connecticut.

19. Defendant Noble is an individual residing at 3 Dublin Drive, Plymouth, Massachusetts 02360.

## FACTUAL ALLEGATIONS

**I.   Onward's Confidential Information and Trade Secrets**

20. Onward is a leading provider in the staffing industry and conducts business nationwide.

21. Onward has a well-established customer base and services clients throughout the United States, currently under a complete remote-working model as a consequence of the Covid-19 pandemic. Though it operated offices throughout the United States at the time of Noble's hire and through the majority of Noble's employment, Onward no longer owns, operates, or manages physical branch offices.

22. Onward specializes in the recruitment and placement of digital, creative, and marketing professionals in permanent and temporary assignments with employers across all industries including, but not limited to, advertising, finance, entertainment, technology, hospitality, and retail.

23. Onward's customers are businesses and employers within these industries who recruit and retain qualified candidates for open positions.

24. The positions Onward staffs for these customers are highly specialized and often relate to web design, user experience, art direction, mobile development, and digital marketing, specifically staffing, for example: marketing managers, analysts and coordinators; research, product and communications managers; graphic designers and presentation specialists; and editorial assistants, social media and communications coordinators.

25. Onward's business is highly competitive and constantly evolving.

26. To conduct its business, Onward relies upon confidential and trade secret information which includes its candidate and customer contact information, customer needs and preferences, candidate skill profiles, pricing models, cost structures, terms of commercial agreements with customers, current and prospective business plans, information about its current and prospective lines of business, talent or individuals placed at Onward's customers, and targeted customers, industries and markets.

27. This confidential and trade secret information took Onward significant resources and costs and several years to develop.

28. Onward's candidate contact information, business plans and strategies are of great interest to its competitors, such as Beacon, and are not disclosed to anyone outside of Onward.

29. Onward's relationships with businesses and leaders in the digital, creative and marketing industries are the core of its business. Through great time, effort, and expense, Onward developed, nurtured and grew strong business relationships with numerous customers around the United States, including, but not limited to, a number of high value accounts.

30. The high value accounts are a major source of Onward's business.

31. The high value accounts are principally, but not exclusively, comprised of large national and global businesses who specifically engage Onward to provide staffing solutions on a recurring basis.

32. Onward employs and dedicates an exclusive team of staffing professionals to create comprehensive and customized strategies to deliver talent fulfillment programs for these high value accounts.

33. To implement these programs, Onward maintains an established internal recruitment industry network.

34. With respect to all of its customers, including the high value accounts, Onward has developed and maintains confidential information and trade secrets that includes, but is not limited to, information about their current and future staffing needs and preferences, bill rates, pricing and revenue information, candidate information, information about whether they will be hiring and expanding their business, the terms of negotiated agreements, and the identities of the key players and decision makers.

35. In addition to the above, to be able to meet customer needs, Onward has spent years amassing data regarding hundreds of thousands of potential candidates, which includes their contact information, skills sets, and current employment status. This information is confidential and is essentially a road map for a competitor to take market share away from and ultimately harm Onward's business.

36. Were Onward's confidential information and trade secrets disclosed to a competitor, such as Beacon, it could be used to gain an advantage over Onward in the marketplace.

37. Onward stores its confidential information and trade secrets in an internal database called Bullhorn with limited access for its employees. Only Onward employees—each with unique

login credentials—have access to Bullhorn.

38. In the wake of the Covid-19 pandemic, the demand for temporary staffing services, such as those provided by Onward, has increased significantly due to unstable and evolving economic conditions for which clients rely more heavily on temporary labor to adapt to the unpredictable and inconsistent surging and declining market needs.

39. This increasing demand for Onward's services makes its key employees, such as Noble, who readily can access and pilfer away Onward's clients and talent, even more valuable. In other words, Noble is a double threat to, and can unfairly compete with, Onward because his role for Onward involved both responsibility for key client management and the talent, who are highly valuable to the client given the unusual market conditions created by the Covid-19 Pandemic and post-Pandemic demand for services.

**II.   Defendant's Employment History with Onward Search LLC**

40. On June 18, 2008, Onward hired Noble as a Recruiter in its Wilton, Connecticut office.

41. As a Recruiter, Noble managed a set of Onward client accounts and was charged with addressing staffing and recruiting needs for clients located in the Northeastern United States.

42. On June 18, 2008, in connection with his employment at Onward, Noble signed and agreed to an offer letter containing non-disclosure, non-competition, and non-solicitation provisions (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached as Exhibit A.

43. In or about 2010, Noble relocated to Boston, Massachusetts and continued working for Onward from Onward's Boston office.

44. On July 23, 2014, Onward promoted Noble to Senior Account Executive, increasing his base compensation and reiterating the non-disclosure, non-competition, and non-

solicitation provisions included in his Employment Agreement.

45. On January 14, 2016, Onward promoted Noble again, this time to Regional Vice President of Operations, again increasing his base compensation and reiterating the non-disclosure, non-competition, and non-solicitation provisions included in the Employment Agreement. With this promotion, Noble was elevated to become a member of Onward's executive team, on which he remained until he voluntarily resigned.

46. The executive team consisted of all Regional and Senior Vice Presidents and above. The executive team meets weekly or bi-weekly with the Onward President and/or CEO and has responsibility for directing Company operations, culture, policy, and strategy.

47. On August 19, 2016, Onward promoted Noble to Vice President of Client Relations. In this role, Noble oversaw Onward's staffing and recruiting teams in the following locations: Boston, Massachusetts; Chicago, Illinois; and London, England.

48. On July 20, 2020, Onward promoted Noble a final time to Vice President of Client Services, Strategic Accounts (which was later re-organized to the "Northeast" division).

49. Both in his role as the Vice President of Client Relations and as the Vice President of Client Services, Strategic Accounts, Noble managed client accounts throughout the Northeastern United States, working with some of Onward's largest client accounts to fulfill staffing needs and fill open positions in UX/UI, Design/Art Direction, Product Design, Project Management, Copy/Content, Front End Development, Mobile/Web Development and Marketing (including, but not limited to, Coordination, Email, Social, Search, and Digital).

50. Both in his role as the Vice President of Client Relations and as the Vice President of Client Services, Strategic Accounts, Noble also provided recruiting and staffing services to Onward's clients.

51. As the Vice President of Client Services, Strategic Accounts, Noble managed a team of 12 employees, consisting of Account Executives and Recruiters, based in and/or focused on clients located in the Northeast. Noble oversaw all aspects of his direct reports' employment, including, but not limited to, managing their recruiting efforts and client contacts, addressing compensation, and monitoring their performance. The employees who reported directly to Noble supported accounts based in the Northeast and national or Managed Service Provider accounts throughout the United States.

52. At the start of the Covid-19 Pandemic, Onward closed its Boston office. Noble relocated to Plymouth, Massachusetts and continued to work remotely for Onward from his home located at 3 Dublin Drive, Plymouth, Massachusetts 02360.

53. Noble's remote working location in Plymouth, Massachusetts constitutes the office location in which he last worked for Onward.

### III. Defendant's Employment Agreement with Onward

54. On June 18, 2008, Noble entered the Employment Agreement, the terms of which are set forth in Onward's offer letter to Noble.

55. The Employment Agreement provided Noble with a starting annual base salary equivalent to $45,000, benefits, and the opportunity to earn substantial incentive compensation.

56. At the time of his resignation, Noble earned an annual base salary equivalent to $105,000 and was eligible for substantial incentive compensation, including annual budget bonuses, performance bonuses, cross-selling incentives, and individual commissions.

57. Based on the base salary increase associated with Noble's repeated promotions, his incentive compensation eligibility, and the commissions he earned from his sales success, Noble was a highly compensated employee at Onward.

58. Pursuant to the Employment Agreement, Onward also granted Noble access to

Onward's confidential information and trade secrets, including, but not limited to, lists of clients and prospects, all contacts at each client, lists of talent/candidates, open jobs, bill and pay rates, sales pipelines, activity and production metrics, all contracts, compensation and incentive plans for all staff, office business plans and budgets, and access to financial information for the territories he supervised such as revenue and gross margin.

59. In consideration of these and other benefits Noble received pursuant to the Employment Agreement and incidental to his employment with Onward, Noble agreed to, among other obligations, refrain from engaging directly or indirectly in certain conduct both during and after the termination of his employment.

60. Noble's original Employment Agreement, which has been subject to non-material updates since 2008, states in relevant part:

> **4. Disclosure of Information:** You agree, during the term of this Agreement and at all times thereafter, to treat as confidential and, except as required in the performance of your duties under this Agreement, not to disclose, publish or otherwise make use of for yourself or for any other person, business, corporation or other entity or make available to the public, any trade secrets or other confidential information concerning the business, employees, clients, methods, operations, financing or services of the Company or any of its affiliates. You agree that all trade secrets and confidential information are the exclusive property of the Company. Trade secrets and confidential information shall mean all information in any way concerning the products, projects, activities, business or affairs of the Company acquired by you in the course of providing services to the Company, and not generally known in the industry.
>
> **6. Covenant Not to Compete:**
>
> a.) You agree that you will not during the term hereof and for a period of one (1) year after termination of your employment, regardless of the cause of termination, in **Wilton, CT** or any other affiliated company office within a radius of sixty (60) miles from any such office engage in any business or perform any service, directly or indirectly, in competition with the business of the Company or any of its affiliates, or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be retained by, associated with, lend your credit to, or render services or advice to, any business (regardless of how it is structured) that provides goods and services to persons and entities whose services, products or activities materially compete with the services, products or activities

10

provided by, or engaged in, by the Company; provided, however, that you may purchase or otherwise acquire up to (but not more than) one percent of any class of securities of any Competing Business (but without otherwise participating in the activities of such Competing Business) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934. You agree that this covenant is reasonable with respect to its duration, geographical area, and scope.

b.) In furtherance of the foregoing, and not in limitation thereof, you agree that you will not during the period of non-competition and within the geographical area herein set forth, directly or indirectly:

1. solicit or service in any way, on behalf of yourself or on behalf of or in conjunction with others, any client, customer or employee, or prospective client, customer or employee, which has been solicited, serviced or engaged by the Company or any of its affiliates within twelve (12) months prior to the termination of this employment;

2. enter into any contract or arrangement for personal services or employment with any person who during the prior twelve (12) months was an employee of the Company or any of its affiliates or who provided personal services to the Company or any of its affiliates as an independent contractor.

3. you will not directly or indirectly, (1) induce or attempt to induce any employee of or consultant to Company to leave the employ of Company, (2) in any way interfere with the relationship between Company and any employee of Company, (3) employ, or otherwise engage as an employee, consultant or independent contractor, the services of any person who during the twelve (12) months prior to this termination was employed by the Company or engaged as a consultant or independent contractor of the Company, (4) induce or attempt to induce any customer, supplier, licensee, or business relation of Company to cease doing business with Company, or in way interfere with the relationship between any customer, supplier, licensee, or business relation of Company, or (5) solicit from, or provide goods or services of the type that Company provides to, any person who is or was a customer of Company at any time during your employment with the Company.

4. you will not, at any time during or after your employment with the Company, knowingly disparage the Company or any of its affiliates.

61. By signing the Employment Agreement, Noble agreed to the following remedies

in the event of his breach of the agreement:

**7. Remedies of the Employer:** As an employee of the Company, you shall have access to customer lists, trade secrets and other confidential information of the Company or any of its affiliates. Moreover, your continued employment will be

11

instrumental to the continuity and development of the Company's business. You, therefore, acknowledge that (notwithstanding the fact that this employment is terminable at will) the restrictions contained in this offer of employment are reasonable and necessary protection of the legitimate interests of the Company, that any violation of them would cause substantial injury to the Company or any of its affiliates, and that the Company would not have entered into this employment with you without receiving the additional consideration of you binding yourself to said restrictions. In the event of any violation of the said restrictions, the Company shall be entitled, in addition to any other remedy, to preliminary and permanent injunctive relief. Should the Company prevail in any action hereunder, the Company shall be entitled to any and all cost of suit and reasonable attorneys fees.

**IV.    Defendant's Employment with Beacon**

62. On February 7, 2022, Noble resigned from his employment with Onward. Upon information and belief, Noble immediately joined Beacon, a direct Onward competitor, to work remotely from his home located at 3 Dublin Drive, Plymouth, MA 02360.

63. Beacon also has a Boston office, which is within the 60 mile radius of Noble's residence.

64. Noble's Employment Agreement prevents him from working from a location that is within a 60 mile radius of an Onward office from where he conducted business or performed services for Onward. During Noble's employment with Onward, Noble worked at times from Onward's Boston office.

65. Beacon, like Onward, offers recruitment, staffing, and talent services in the digital, creative, and marketing industries. According to Beacon's website, its Beacon Hill Associates division lists among the practice areas that it services, "**Marketing and creative.** Content, design and distribution are all important. Creative professionals are in extreme demand and our team will connect you with marketing talent at all levels." *See* Beacon Hill Staffing, Beacon Hill Associates, https://www.beaconhillstaffing.com/bh-associates.

66. Beacon pairs its clients with candidates possessing a variety of skillsets, including "Marketing & Communications," specifically: Marketing Managers, Analysts and Coordinators;

Research, Product and Communications Managers; Graphic Designers and Presentation Specialists; and Editorial Assistants, Social Media and Communications Coordinators. *Id.*

67. Onward offers these same services to clients in the same industries, as described in paragraphs 20 through 39 of this Complaint.

68. Upon information and belief, Noble remains employed at Beacon and, upon information and belief, is currently serving in a senior management and/or recruitment role.

69. Owens sent Noble an email dated February 18, 2022 to his Onward email address asking Noble and other recipients to identify candidates for a UI/UX position for a Beacon client. *See* E-mail from Leanne Owens to Tim Sullivan, et al. re: additional UX candidates (Feb. 18, 2022), attached as Ex. B.

70. That same day, Owens sent Noble another email at his Onward email address apparently discussing a client that Onward also services. *See* E-mail from Leanne Owens to Tim Sullivan, et al. re: additional UX candidates (Feb. 18, 2022), attached as Exhibit C.

71. At the very least, Owens' emails to Noble, addressed to his Onward email address after his last day of employment, make it clear that Noble is working in the same industry and is servicing the same clients that Onward services. At most, Owens' emails evidence Noble's use of Onward's confidential information and trade secrets to unfairly compete against Onward.

72. Noble's remote work for Beacon from Plymouth, Massachusetts violates the terms of his Employment Agreement because he is working in the same location and/or affiliated company office from which he performed recruitment and staffing services for Onward.

73. As a result, Noble is currently working in direct competition with Onward in violation of the Employment Agreement.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract)

74. Onward repeats and realleges each and every allegation contained in paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75. The Employment Agreement between Onward and Noble constitutes a valid and enforceable contract.

76. Onward fully performed its obligations under the Employment Agreement with Noble.

77. Pursuant to the Employment Agreement, for twelve months following his separation from Onward, Noble is obligated to refrain from competing against Onward within a radius of sixty (60) miles of any Onward office location from which he last worked for Onward.

78. Pursuant to the Employment Agreement, for twelve months following his separation from Onward, Noble is obligated to refrain from directly and indirectly soliciting Onward clients with whom he worked in the last twelve months of his employment with Onward.

79. Noble's remote working location in Plymouth, Massachusetts constitutes the office location in which he last worked for Onward.

80. Noble breached the Employment Agreement by competing against Onward through, upon information and belief, his remote employment with Beacon from his residence in Plymouth, Massachusetts, which office is located in the same city for which he performed his job duties for Onward.

81. Noble breached the Employment Agreement on or about February 18, 2022 by soliciting or assisting Beacon to solicit an Onward client.

82. As a consequence of the foregoing, Onward has suffered, and will continue to

suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

83. Onward repeats and realleges each and every allegation contained in paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84. By virtue of his conduct, Noble breached his implied covenant of good faith and fair dealing with Onward.

85. As a consequence of the foregoing, Onward has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION
### (Unfair Competition)

86. Onward repeats and realleges each and every allegation contained in paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87. By the aforesaid acts, Noble has committed acts of unfair competition against Onward.

88. The actions of Noble were committed with malice and/or with the intent of harming and/or destroying Onward's business.

89. Accordingly, Noble is liable to Onward in an amount to be decided at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Onward respectfully requests that the Court grant the following relief:

a. An Order preliminarily, through a temporary restraining order, and permanently enjoining and prohibiting Noble from further unfair methods of competition and unfair or deceptive acts or practice;

b. An Order preliminarily, through a temporary restraining order, and permanently

enjoining and prohibiting Noble from competing against Onward in violation of the Employment Agreement;

      c.      An Order permanently enjoining and prohibiting Noble from wrongfully soliciting or interfering with Onward's relationship with its employees;

      d.      An Order permanently enjoining and prohibiting Noble from wrongfully soliciting or interfering with Onward's corporate and individual clients and customers;

      e.      An Order requiring the immediate return of Onward's trade secrets and confidential information in Noble's possession;

      f.      Judgment against Noble for compensatory damages, plus costs, interests, and reasonable attorneys' fees; and

      g.      Such other and further relief as this Court may deem proper.

March 9, 2022                      Respectfully submitted,

                                              **NELSON MULLINS RILEY & SCARBOROUGH LLP**

                                              */s/ James S. Rollins*
James S. Rollins
james.rollins@nelsonmullins.com
Bar No. CT05795
Patrick T. Uiterwyk
patrick.uiterwyk@nelsonmullins.com
Bar No. CT28119
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
T 617-217-4700
F 517-217-4710

Mitchell Boyarsky*
mitch.boyarsky@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
280 Park Avenue
15th Floor West

New York, New York 10017
T 646-428-2619
F 646-428-2610

Shaniqua L. Singleton*
shaniqua.singleton@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
201 17th Street, Suite 1700
Atlanta, Georgia 30363
T 404-322-6000
F 404-322-6050

*Attorneys for Plaintiff Onward Search, LLC*

*\* Application for admission pro hac vice forthcoming*